Well, the next case, which is Tim Harms v. Industrial Commission, 3090710. Counsel, please. Good afternoon, Your Honors. This is not a case of first impression. Didn't we just see this morning? Yes. You're not back on a case of first impression? No. I think you've probably seen this. How did you have the influence to move your case up? I was going to thank you for that. My son has a medical procedure meeting that the parents have to be at today. So, thank you very much for your consideration. I'm here on behalf of Mr. Harms, a fire worker since 1989, and we just heard the case before us talking about manifest weight. Is there evidence to support the Commission's decision? Why should this case be the one where manifest weight does not prevent Mr. Harms from getting a reverse? Now, you've got the hurdle in front of you on this case, right? Yes. And a couple weeks ago. And, you know, the main argument here we have, and I make it in there, is looking at Dr. Martin's opinions. Because that seemed to be the main basis for the Commission's decision and arbitrators' as well. And the brief sets forth and talks about the standard that an expert's opinion can't stand if there isn't a factual basis to support that expert's opinion. Just because they say it is doesn't make it so. There has to be some type of factual basis, some type of logic, some type of reasoning to support the final conclusion so that we have decisions that are based upon the record, the facts, and that are just. Because there's a lot at stake for Mr. Harms. He's not someone that's had a lot of claims. There's $58,000 in medical bills, TTD, potentially his career on the line in this case. And it's worthy of review. Now, is Dr. Martin's testimony the only problem you see in this case? Well, I think it's the major problem because the other physicians, whether it was earlier in the case when Dr. Weinger had commented in his notes that there was a causal connection between a muscular injury and the degenerative disc disease on aggravation and Dr. Howard's direct, cross, redirect conclusion that there was a causal connection as well, that in order for the respondent to prevail, they have to have some type of countervailing testimony that there's causation in this case. Well, let me ask you about Dr. Howard's testimony. I was going to go to the next question. He was the claimant's, he's the claimant's treating physician. Correct. Didn't he concede that if the claimant's pain was as described by the claimant, he would expect the claimant to have been able to, not expect the claimant to have been able to ride a motorcycle or work as a firefighter? So can't the commission use that against him? Right, and some of it goes to, you know, his symptoms waxing and waning. I think Mr. Harms had testified that it could vary from a 4 or a 5 up to an 8, maybe a little bit less. Mr. Dr. Howard, I believe, testified a 4 or a 5 on a motorcycle, yes, an 8, no. And that's the thing, the other thing that Dr. Howard commented on, these pain scales are, you know, subjective. What a 4 and a 5 is to Mr. Harms might be a 3 to me and a 6 to somebody else. So I don't know how objective that is in that regard. And it's not something that Mr. Harms hid from anyone in this case. I mean, he testified it's an easy riding motorcycle. No evidence he drove it more than 30 minutes or 30 miles from his location. No physician ever restricted him from this type of activity. Same thing with the volunteer firefighting. I mean, that wasn't even commented on in the commission's decision. And the chief is the first person that testified that said we knew about his injury right away. He was on light duty operating the pumper. All he's doing is pushing a button. So it's not like he's out engaging in strenuous firefighting activity. I believe the commission, though, found that maybe there was some malingering, reading between the lines, because they noted following Martin's release to return to work, the claimant was given a spinal injection, other treatment, none of which alleviated any of his pain, and yet he's riding a motorcycle. How do you explain that? Well, I mean, I don't know that the fact that you have back pain is any different than riding in a, I mean, for these short periods of time and waxing and waning. I think that's part of the reason, and this videotape was a perplexing dilemma for me in the case in that my guy admitted he did all that. That was him. He's not saying that anything in the video is an accurate portrayal, other than you can't see the pain that he's in. But the point is, how is that riding on that motorcycle any different than being in a car for that amount of time? I mean, I think that just the fact that he's on a motorcycle, when I come down to it and say, how are they believing this Martin guy, why is Martin being believed here when I look at, he didn't look at the discogram, he didn't have these records, he only says it's a muscular injury, and that's contradicted by the other testimony in the discogram. What is it about this case? And I think it's this darn motorcycle. But nobody restricted him from it. And you're talking about how often did he ride it? We don't even know. We have 47 minutes of videotape. There's a million minutes of his life have gone by, and we don't know that he's riding it every day, what type of terrain he's on, what he's, you know. And he admitted to doing that. I don't see how that's the problem. Any evidence in the record to explain why these symptoms wouldn't have been alleviated following a spinal infection? I mean, why wouldn't that alleviate any of his pain? I mean, I don't know why. I'm not a physician in terms of that. And Dr. Howard, he was, you know, he's aware of these factors in the case. Dr. Martin, you know, after these injections in the discogram, he didn't see him since I think it was June of 06 in this case. You know, he had significant degenerative disc disease in this matter, and sometimes epidural steroid injections work as we've seen, and sometimes they don't. The efficacy of it is not 100%. Wasn't it Howard that said he wouldn't expect this man to be riding a motorcycle or participating in any volunteer firefighting activities based upon his pain description? Was Howard, wasn't Martin that said that? No, Howard said that, and I believe that was on a question from Mr. Kamen when talking about his pain rating when he went to the functional capacity exam. And again, Howard said a 4 and a 5 maybe. It's kind of equivocal, and again, you're on this pain scale issue where it is one person's pain versus the other. I just don't see, really, for someone, because someone's riding a motorcycle. At least not jogging. And jogging. I mean, people, I mean, we can't ignore everyday experience in life. People have back pain and jog 10 or 15 feet. I don't know what that would show in this case. And so, went to great length in the brief to show why I thought Dr. Martin's opinions didn't have a factual basis. Then I come to this videotape, which is such a short snippet of his life, and say, I got Dr. Howard board certified, Dr. Weinger, who retired. I mean, Dr. Weinger was willing to consider a fusion in this case, and Dr. Martin's calling it a muscle strain. And Dr. Weinger had been before this panel many times, and he's not an unrespected physician by any means. And Dr. Howard, with still all of this, you know, with the talk of the motorcycle, or in the questions regarding the injection, was sticking with his patient, Mr. Harms. He didn't abandon him in this case. And for these reasons, I suggest that the commission's decisions against the manifest weight. Thank you. May it please the court, John Kamen on behalf of the respondent lawyer, Seaway Fabricators. The commission's decision is not contrary to the manifest weight of the evidence, and it was not an abuse of discretion to admit the video. The two-prong test is, does the video accurately depict what's in it? Mr. Harms admitted that. That's me. That's my activity level in those days. It's not necessary, and it's Mr. Harms' ability to testify as to what his other activity levels may or may not have been at a particular time. And then the next prong to the video is whether it's probative of anything. And Dr. Howard, as treating doctor, established that it's probative of something, specifically that you wouldn't expect someone with the pain level ratings that he's giving and the description of pain that he gave to Dr. Howard, Mr. Harms gave Dr. Howard, to be engaging in those particular activities. And obviously, Dr. Martin thought it was probative as well, reviewing the video and concluding that these things are inconsistent with someone who has a permanent aggravation of degenerative disc disease. I think we have to walk into this realizing he gave a history of, I've had problems with my back for eight to ten years. I had problems three years before I was working. And there's a specific opinion from Dr. Martin after taking a look at this gentleman saying, I think he's back to where he was at the beginning. And you can walk away from the case on a manifest weight standard right there. And Dr. Martin had more than just the video to base his opinion. He conducted a physical examination. He reviewed some past medical records. He also took a look at the FCE and CRT testing and noted discrepancies. And that brings me to an important point in this case. You were asking, aren't there other pieces of evidence that are a problem? Dr. Kube is a problem for Petitioner 2. He's the first, he's the second treating orthopedic surgeon that saw him in August of 2006 and said, I'm looking at this FCE and this CRT testing and I'm noting inconsistencies. I don't have a basis to restrict you from work, go back to regular duty. So you had two different physicians that had released this gentleman back to regular duty. And on that basis, clearly there's substantial evidence to support denial of a TTD. And on the same basis, looking at Dr. Martin's recourse conclusions, there's more than adequate evidence to support a denial of a medical after this particular examination took place. So on that basis, we would ask that the Commission's decision be affirmed, requiring any questions from the Court. Thank you, counsel. And just so it's clear on the record, Dr. Kube said there's an inconsistency. There's an inconsistency in the physical demand level obtained in each day. One day it was higher after the first FCE. The second day on more of a computer test, it was a physical demand lower. The examiners never said that his performance each of those days was inconsistent. They said that he gave a full effort during both of the tests. So you have to look at what the actual, I mean you can just look at it and say there's a difference, but you have to understand what the tests are testing. The first day he's lifting weights and recreating his job, and I think he testified to lifting 75 pounds in this case. Then he doubled his medication that night after doing that test. That would explain why there's a difference in the demand level. It's not like they're saying he had Waddell signs or he was, you know, weights marked as something, one weight and it's really lighter, blood pressure's being checked for inconsistencies. They're not saying he's inconsistent or not giving a full effort. So I think the Court, that was another argument made, should understand that that's the meaning or the interpretation of those. Thank you. Thank you, Counsel. The Court will take the matter under advisory for disposition.